**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

JOHN MORRELL & CO.,

        Plaintiff,

vs.

JOSEPH HALBUR, PETE SIMONS,
MARY ANN BORKOWSKI, VERNON
BRINCKS, ERIC BRINCKS, VIRGINIA
HAGEMANN, GREG HALBUR,
MARTIN HALBUR, PAUL HALBUR,
JEFF KLOCKE, HOWARD KOSTER,
ROBERT OVERMOHLE, FRANK
ROSENER, HARRY REIMAN, SALLY
REIMAN, JOHN SIMONS, DALE
THIELEN, CYRIL VENNER,
LAVONNE WERNIMONT, LEON
WERNIMONT, DON GERKEN AND
DOUG GERKEN, INDIVIDUALLY
AND d/b/a D&D GERKEN INC.,
HUBERT HAGEMANN, DICK STARK,
and DIAMOND ENTERPRISES, INC.,

        Defendants.

No. C06-3023-MWB

**MEMORANDUM OPINION AND
ORDER REGARDING
DEFENDANTS' MOTION TO
DISMISS**

———————————

**TABLE OF CONTENTS**

*I.  INTRODUCTION AND BACKGROUND* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    *A.  Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    *B.  Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*II.  LEGAL ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
    *A.  Rule 12(b)(6) Standards* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

**B.  Choice Of Law**  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
**C.  Analysis Of Specific Claims**  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
    **1.**    **Breach of contract claims**  . . . . . . . . . . . . . . . . . . . . . . . . . . 26
    **2.**    **Unjust enrichment claims**  . . . . . . . . . . . . . . . . . . . . . . . . . 30
    **3.**    **Claim for an accounting**  . . . . . . . . . . . . . . . . . . . . . . . . . 32

**III.  CONCLUSION**  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

## I.  INTRODUCTION AND BACKGROUND

### A.  Procedural Background

On April 20, 2006, plaintiff John Morrell & Co. ("John Morrell") filed its complaint in this case against defendants Joseph Halbur, Pete Simons, Mary Ann Borkowski, Eric Brincks, Vernon Brincks, Virginia Hagemann, Greg Halbur, Martin Halbur, Paul Halbur Jeff Klocke, Howard Koster, Robert Overmohle, Frank Rosener, Harry Reiman, Sally Reiman, John Simons, Dale Thelen, Cyril Venner, Lavonne Wernimont, Leon Wernimont, Doug Gerken and Doug Gerken, individually and d/b/a D&D Gerken, Inc., Hubert Hagemann, Dick Stark, and Diamond Enterprises, Inc.  In its petition, plaintiff John Morrell sets out claims against the named defendants, all are hog producers, for breach of contract, unjust enrichment, and for an accounting to determine the amount of money owed John Morrell by each of the defendants.

2

Defendants Joseph Halbur, Pete Simons, Mary Ann Borkowski, Virginia Hagemann, Greg Halbur, Martin Halbur, Paul Halbur, Jeff Klocke, Howard Koster, Robert Overmohle, Frank Rosener, Harry Reiman, Sally Reiman, John Simons, Dale Thelen, Cyril Venner, Lavonne Wernimont, Leon Wernimont, Doug Gerken and Doug Gerken, individually and d/b/a D&D Gerken, Inc., Hubert Hagemann, Dick Stark, and Diamond Enterprises, Inc. filed a motion to dismiss all of the claims found in the Complaint (#42). Defendants Eric Brincks and Vernon Brincks then filed their own motion to join in the other defendants motion to dismiss (#44). The Brincks' motion to join is granted. Therefore, because all of the defendants are seeking dismissal of the claims found in the Complaint and the court will refer to the pending motion to dismiss generally as defendants' motion. Defendants' motion seeks dismissal of Count I and Count II, the breach of contract claims, on the ground that those counts fail to state a valid cause of action for breach of contract against defendants. Similarly, defendants' motion seeks dismissal of Count III and Count IV, the unjust enrichment claims, on the ground that those counts fail to state a valid cause of action for unjust enrichment against defendants. Defendants also seek the dismissal of Count V, the claim for an accounting, on the ground that this claim is derivative of the claims in Counts I through IV, and that upon the dismissal of those counts then the claim for an accounting must also fail as a matter of law. Plaintiff John Morrell has filed a timely response to defendants' motion.

### B. Factual Background

On a motion to dismiss, the court must assume all facts alleged in plaintiff John Morrell's Complaint are true, and must liberally construe those allegations. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). Therefore, the following factual background is drawn from plaintiff John Morrell's Complaint in such a manner.

3

Plaintiff John Morrell & Co. is a corporation organized under the laws of Delaware, with its principal place of business located in Cincinnati, Ohio. John Morrell is in the business of procuring hogs for slaughter, slaughtering hogs, and processing and selling the products of slaughtered hogs.

In the mid to late 1990's several meat packers, including John Morrell, offered hog producers contracts with a pricing formula that, during the term of the contract, provided hog producers with a minimum or "floor price" for their hogs. These contracts were typically for a period of three to five years. These types of contracts were often referred to as "ledger contracts." During the term of these ledger contracts, the meat packer agreed to pay a minimum price for the hog producers' hogs, even when the market price for hogs was less than the floor price in the ledger contract. When the minimum floor price was higher than the market price, the difference paid to the hog producer was reflected as a negative balance on the particular hog producer's ledger account. At the conclusion of the ledger contract, the hog producer was required to pay to the meat packer the amount of the negative ledger balance.

On February 16, 1998, John Morrell entered into three Ledger Contract Program contracts (collectively "Ledger Contracts"). The Ledger Contracts were signed by defendant Pete Simons as "Pete Simons (power of attorney)." Each ledger contract has a space for identifying the hog producer's "trade name" or "doing business as" identifier. On one of the contracts, the "trade name" or "doing business as" is stated to be Diamond Enterprises/Black Walnut ("the Black Walnut Ledger Contract"), on the second it is Diamond Enterprises/Cornerstone ("the Cornerstone Ledger Contract"), and on the third it is Diamond Enterprises/Stone Path ("the Stone Path Ledger Contract"). In the Ledger Contracts, the hog producers to those contracts agreed to deliver 47,000 hogs annually to John Morrell.

4

The Ledger Contracts were executed on behalf of the defendant hog producers by Pete Simons. While there exist corporate entities in Iowa called Diamond Enterprises, Inc., Black Walnut, Inc., Cornerstone, Inc. and five corporations bearing some form of the name "Stone Path," there are no corporate entities bearing the names "Diamond Enterprises/Black Walnut," "Diamond Enterprises/Cornerstone," or "Diamond Enterprises/Stone Path."

During the term of the Ledger Contracts, the market price for hogs was usually less than the contract floor price. This resulted in a growing ledger deficit to the hog producers. Due to the low market price for hogs, John Morrell recognized the possibility of increasing negative ledger balances for hog producers who had entered into ledger contracts with it. To alleviate concerns of such hog producers, John Morrell sent a letter in August, 1998 to "All Long-Term Ledger Contract Producers" which provided, in part, as follows:

> AS WE ENTER THE 1998 FALL MARKETING PERIOD WITH LARGER VOLUMES OF SLAUGHTER HOGS EXPECTED AND A DECLINING PRICE CYCLE ANTICIPATED, JOHN MORRELL HAS BEEN APPROACHED BY SOME OF OUR LEDGER CONTRACT PRODUCERS WITH QUESTIONS CONCERNING THEIR CONTRACTS, THE PURPOSE OF THIS FORM LETTER IS TO INFORM ALL CURRENT CONTRACT PRODUCERS OF JOHN MORRELL'S ANSWERS TO COMMONLY ASKED QUESTIONS.
>
> *Q.)    I'M CONCERNED ABOUT MY ACCOUNT BALANCE GROWING THIS FALL TO A POINT I COULD BE PUTTING MYSELF IN A UNSTABLE FINANCIAL POSITION, IS THERE ANY WAY I CAN LIMIT, DECREASE OR TERMINATE MY NEGATIVE LEDGER BALANCE?*
>
> A.)    JOHN MORRELL DID NOT DEVELOP THIS CONTRACT WITH THE PURPOSE BEING TO PUT A

5

> PRODUCER IN AN UNSTABLE POSITION. JOHN MORRELL WILL ALLOW PRODUCERS TO BRING THEIR ACCOUNT BALANCE TO A NEUTRAL POSITION AT ANY TIME DURING THE CONTRACT PERIOD.
>
> JOHN MORRELL WILL ALSO ALLOW LEDGER PRODUCERS THE OPPORTUNITY TO MARKET THEIR HOGS WHEN PRICES ARE BELOW THE GUARANTEED FLOOR WITHOUT INCREASING THEIR LEDGER BALANCE.
>
> IF ANY PRODUCER HAS THE DESIRE TO TERMINATE HIS CONTRACT, THEY MAY DO SO; SIMPLY BY CONTACTING THE JOHN MORRELL PROCUREMENT OFFICE, STATING YOUR REQUEST AND BRINGING THEIR CURRENT LEDGER BALANCE TO NEUTRAL.

Complaint, Ex. 5, John Morrell letter at 1 (emphasis original).

The hog producers in the Ledger Contracts made limited use of this offer and continued to make ledger sales to John Morrell when the market price was below the contract floor price, thereby increasing the size of their ledger deficits.

Magnolia, Inc. is an Iowa family farm corporation with its principal place of business in Carroll, Iowa. Magnolia, Inc. is a partner of the Mahogany Partnership, which was formed to farm and own agricultural land and to own and operate a pork nursery operation in Carroll County, Iowa. Defendants John Simmons and Pete Simmons collectively own a majority stake in Magnolia, Inc.

Mahogany, Inc. is an Iowa family farm corporation with its principal place of business in Carroll, Iowa. Mahogany, Inc. is a partner in the Mahogany Partnership, which was formed to farm and own agricultural land and to own and operate a pork nursery operation in Carroll County, Iowa. Defendants Greg Halbur, Joseph Halbur, Martin Halbur, and Paul Halbur collectively own a majority stake in Mahogany, Inc.

6

Mahogany Partnership is a partnership with its principal place of business in Carroll, Iowa. It was formed to farm and own agricultural land and to own and operate a pork nursery operation in Carroll County, Iowa ("Mahogany Nursery").

Oakleaf Limited Partnership is a partnership with its principal place of business in Coon Rapids, Iowa. Oakleaf Limited Partnership owned and operated a 3,120 sow to weaner pig operation in Carroll County, Iowa (the "Oakleaf Unit").

Oakleaf Ltd. is an Iowa limited liability corporation with its principal place of business in Carroll, Iowa. Oakleaf Ltd. was initially incorporated to act as the general partner in the Oakleaf Limited Partnership for the construction and building of a 1,200 sow farrowing and feeder pig operation in Carroll County, Iowa. In 1997, Oakleaf Ltd. executed an agreement with Oakleaf Limited Partnership for the expansion of the 1,200 sow farrowing to nursery operation to the 3,120 sow Oakleaf Unit.

Black Walnut, Inc. ("Black Walnut") is an Iowa family farm corporation with its principal place of business in Carroll, Iowa. Black Walnut owns a hog finishing facility in Carroll, Iowa, but does not own the hogs which are finished at its facility. Cornerstone Partnership is a partnership with its principal place of business in Audubon, Iowa. The Cornerstone Partnership owns and operates a sow farrowing unit.

Defendant Diamond Enterprises, Inc. ("Diamond Enterprises") is an Iowa Corporation with its principal place of business in Carroll, Iowa. Diamond Enterprises provided bookkeeping and management services to the owners of the Mahogany Nursery, the owners of the hog finishing facilities known as Black Walnut and Stone Paths I-IV, and to the owners of the hogs that were raised at the Mahogany Nursery and finished at one of the previously mentioned finishing facilities and then delivered to John Morrell under the terms of the Black Walnut and Stone Path Ledger Contracts. Diamond Enterprises also provided bookkeeping and management services to the owners of the Cornerstone sow unit

and to the owners of the hogs that originated at the Cornerstone sow unit, were finished primarily at the Stone Path IV and V hog finishing facilities and delivered to plaintiff John Morrell under the terms of the Cornerstone Ledger Contract.

Diamond Enterprises communicated directly with John Morrell concerning the delivery of the defendant producer's hogs to John Morrell and received checks from John Morrell for payment for those hogs under the terms of the three ledger contracts. Diamond Enterprises owned no hogs itself.

Stone Path, Inc. ("Stone Path I") is an Iowa family farm corporation with its principal place of business in Carroll, Iowa. Stone Path I owns a hog finishing facility located in Carroll County, Iowa, but does not own the hogs finished at its facility.

Stone Path II, L.L.C. ("Stone Path II") is an Iowa limited liability corporation with its principal place of business in Carroll, Iowa. Stone Path II owns a hog finishing facility located in Carroll County, Iowa, but does not own the hogs finished at its facility.

Stone Path III, L.L.C. ("Stone Path III") is an Iowa limited liability corporation with its principal place of business in Carroll, Iowa. Stone Path III owns a hog finishing facility located in Carroll County, Iowa, but does not own the hogs finished at its facility.

Stone Path IV, L.L.C. ("Stone Path IV") is an Iowa limited liability corporation with its principal place of business in Carroll, Iowa. Stone Path IV owns a hog finishing facility located in Carroll County, Iowa, but does not own the hogs finished at its facility.

Stone Path V, L.L.C. ("Stone Path V") is an Iowa limited liability corporation with its principal place of business in Carroll, Iowa. Stone Path V owns a hog finishing facility located in Carroll County, Iowa, but does not own the hogs finished at its facility.

The Mahogany Group or Mahogany Producers is a group of individuals and entities who owned hogs that were born at the Oakleaf Unit, raised at the Mahogany Nursery, finished at the Black Walnut, Stone Path I, Stone Path II, or Stone Path III hog finishing

Case 3:06-cv-03023-MWB   Document 56   Filed 03/05/07   Page 8 of 32

facilities and delivered to John Morrell under the terms of the Black Walnut and Stone Path Ledger Contracts. The following individuals and entities, *inter alios*, owned hogs that were raised at Stone Path V and are part of the Mahogany Group or Mahogany Producers: Joseph Halbur, Pete Simons, Mary Ann Borkowski, Eric Brincks, Vernon Brincks, Virginia Hagemann, Greg Halbur, Martin Halbur, Paul Halbur Jeff Klocke, Howard Koster, Robert Overmohle, Frank Rosener d/b/a Rosener Farms, Inc., Harry Reiman and Sally Reiman d/b/a Sals Ins. Inc., John Simons, Dale Thelen, Cyril Venner, Lavonne Wernimont, Leon Wernimont.

The Cornerstone Group or Cornerstone Producers is a group of individuals who owned the hogs that were born at the Cornerstone sow unit, raised at several different nurseries, finished primarily at the Stone Path IV or Stone Path V hog finishing facilities and delivered to John Morrell under the terms of the Cornerstone Ledger Contract. The following individuals, *inter alios*, are members of the Cornerstone Group or Cornerstone Producers: Pete Simons, John Simons, Doug Gerken, Doug Gerken, Hubert Hagemann, Dick Stark, and Howard Koster.

Defendant Mary Ann Borkowski is an individual residing in Carroll, Iowa. She is a shareholder in Stone Path I. She is a member of the Mahogany Group and has an ownership interest in the hogs finished at the Black Walnut and Stone Path hog finishing facilities and delivered to John Morrell under the terms of hog procurement contracts. She is an intended beneficiary of the hog procurement contract with John Morrell that was signed on her behalf by Pete Simons.

Defendant Eric Brincks is an individual residing in Glidden, Iowa. He is a partner of the Oakleaf Limited Partnership and a limited member of Oakleaf Ltd. He is a shareholder of Magnolia, Inc. and a partner in the Mahogany Partnership, as well as director of Diamond Enterprises. He leased pig spaces from the Mahogany Nursery. In

addition, he is a member of the Mahogany Group and has an ownership interest in the hogs finished at the Black Walnut and the Stone Path hog finishing facilities and delivered to John Morrell under the terms of hog procurement contracts. He is an intended beneficiary of the hog procurement contract with John Morrell that was signed on his behalf by Pete Simons.

Defendant Vernon Brincks is an individual residing in Carroll, Iowa. He is a member of the Mahogany Group and has an ownership interest in the hogs finished at the Black Walnut and Stone Path hog finishing facilities and delivered to John Morrell under the terms of hog procurement contracts. He is an intended beneficiary of the hog procurement contract with John Morrell that was signed on his behalf by Pete Simons.

Defendant Virginia Hagemann is an individual residing in Carroll, Iowa. She is a partner of the Oakleaf Limited Partnership and a limited member of Oakleaf Ltd. She is a member of the Mahogany Group and has an ownership interest in the hogs finished at the Black Walnut and Stone Path hog finishing facilities and delivered to John Morrell under the terms of hog procurement contracts. She is an intended beneficiary of the hog procurement contract with John Morrell that was signed on her behalf by Pete Simons.

Defendant Greg Halbur is an individual residing in Sioux City, Iowa. He is a partner of the Oakleaf Limited Partnership. He is a shareholder of Mahogany, Inc. and a partner in the Mahogany Partnership. He is a shareholder of Stone Path I. He leases pig spaces from the Mahogany Nursery. In addition, he is a member of the Mahogany Group and has an ownership interest in the hogs finished at the Black Walnut and the Stone Path hog finishing facilities and delivered to John Morrell under the terms of hog procurement contracts. He is an intended beneficiary of the hog procurement contract with John Morrell that was signed on his behalf by Pete Simons.

10

Defendant Joseph Halbur is an individual residing in Carroll, Iowa. He is a partner of the Oakleaf Limited Partnership and a limited member of Oakleaf Ltd. He is the president, secretary, treasurer, and a director of Oakleaf Ltd. He is also a shareholder, as well as the president, secretary, treasurer, and director of Mahogany, Inc. and a partner in the Mahogany partnership. In addition, he is president, secretary, and director of Black Walnut, Inc. and Stone Path, Inc. He is also treasurer of Diamond Enterprises. He leases pig spaces from the Mahogany Nursery. In addition, he is a member of the Mahogany Group and has an ownership interest in the hogs finished at the Black Walnut and Stone Path hog finishing facilities and delivered to John Morrell under the terms of hog procurement contracts. Joseph Halbur is an attorney and one of the individuals responsible for creating the series of corporations and partnerships that owned the facilities at which the hogs delivered to John Morrell under the terms of the procurement contracts were born and raised to slaughter weight. He was also one of the individuals responsible for forming Diamond Enterprises.

Defendant Martin Halbur is an individual residing in Carroll, Iowa. He is a partner of the Oakleaf Limited Partnership, and a limited partner of Oakleaf Ltd. He is a shareholder of Mahogany, Inc. and a partner in the Mahogany Partnership. He is also a director for Black Walnut, Inc. He leases pig spaces from the Mahogany Nursery. In addition, he is a member of the Mahogany Group and has an ownership interest in the hogs finished at the Black Walnut and the Stone Path hog finishing facilities and delivered to John Morrell under the terms of hog procurement contracts. He is an intended beneficiary of the hog procurement contract with John Morrell that was signed on his behalf by Pete Simons.

11

Defendant Paul Halbur is an individual residing in Omaha, Nebraska.  He is a partner of the Oakleaf Limited Partnership, and a limited partner of Oakleaf Ltd. He is a shareholder of Mahogany, Inc. and a partner in the Mahogany Partnership.  He is also a shareholder of Stone Path, Inc. He leases pig spaces from the Mahogany Nursery.  In addition, he is a member of the Mahogany Group and has an ownership interest in the hogs finished at the Black Walnut and the Stone Path hog finishing facilities and delivered to John Morrell under the terms of hog procurement contracts.  He is an intended beneficiary of the hog procurement contract with John Morrell that was signed on his behalf by Pete Simons.

Defendant Jeff Klocke is an individual residing in Carroll, Iowa.  He is a partner of the Oakleaf Limited Partnership and a limited partner of Oakleaf Ltd.  He leases pig spaces from the Mahogany Nursery.  In addition, he is a member of the Mahogany Group and has an ownership interest in the hogs finished at the Black Walnut and the Stone Path hog finishing facilities and delivered to John Morrell under the terms of hog procurement contracts.  He is an intended beneficiary of the hog procurement contract with John Morrell that was signed on his behalf by Pete Simons.

Defendant Howard Koster is an individual residing in Carroll, Iowa.  He is a partner of the Oakleaf Limited Partnership and a limited member of Oakleaf Ltd.  He is also a shareholder of Mahogany, Inc. and a partner in the Mahogany partnership. He is also a director of Diamond Enterprises.   He leases pig spaces from the Mahogany Nursery.  In addition, he is a member of the Mahogany Group and has an ownership interest in the hogs finished at the Black Walnut and Stone Path hog finishing facilities and delivered to John Morrell under the terms of hog procurement contracts.  In addition, he has an ownership in the hogs that originate at Cornerstone and are finished at various Stone Path hog finishing facilities and delivered to Morrell under the terms of the hog procurement contracts.  He

12

is an intended beneficiary of the hog procurement contract with John Morrell that was signed on his behalf by Pete Simons.

Defendant Robert Overmohle is an individual residing in Carroll, Iowa. He is a member of the Mahogany Group and has an ownership interest in the hogs finished at the Black Walnut and Stone Path hog finishing facilities and delivered to John Morrell under the terms of hog procurement contracts. He is an intended beneficiary of the hog procurement contract with John Morrell that was signed on his behalf by Pete Simons.

Defendant Frank Rosener d/b/a Rosener Farms, Inc. ("Rosener Farms") is an individual residing in Vail, Iowa. Rosener Farms is a partner of the Oakleaf Limited Partnership. Rosener Farms is a member of the Mahogany Group and has an ownership interest in the hogs finished at the Black Walnut and the Stone Path hog finishing facilities and delivered to John Morrell under the terms of hog procurement contracts. Frank Rosener is an intended beneficiary of the hog procurement contract with John Morrell that was signed on his behalf by Pete Simons.

Defendants Harry and Sally Reiman d/b/a Sals Ins., Inc. ("Sals") are individuals residing in Carroll, Iowa. Sals is a partner of the Oakleaf Limited Partnership. Sals is also a member of the Mahogany Group and has an ownership interest in the hogs finished at the Black Walnut and the Stone Path hog finishing facilities and delivered to John Morrell under the terms of hog procurement contracts. Harry and Sally Reiman are intended beneficiaries of the hog procurement contract with John Morrell that was signed on their behalf by Pete Simons.

Defendant John Simons is an individual residing in Glidden, Iowa. He is a partner of the Oakleaf Limited Partnership and a limited member of Oakleaf Ltd. He is also a shareholder of Magnolia, Inc. and a partner in the Mahogany partnership. He leases pig spaces from the Mahogany Nursery. In addition, he is a member of the Mahogany Group

and has an ownership interest in the hogs finished at the Black Walnut and Stone Path hog finishing facilities and delivered to John Morrell under the terms of hog procurement contracts. In addition, he has an ownership in the hogs that originate at Cornerstone and are finished at various Stone Path hog finishing facilities and delivered to Morrell under the terms of the hog procurement contracts. He is an intended beneficiary of the hog procurement contract with John Morrell that was signed on his behalf by Pete Simons.

Defendant Pete Simons is an individual residing in Carroll, Iowa. He is a partner of the Oakleaf Limited Partnership and a limited member of Oakleaf Ltd. He is also a director of Oakleaf Ltd. He is also a shareholder, as well as the president, secretary, treasurer, and director of Magnolia, Inc. and a partner in the Mahogany Partnership. He, along with other members of his family, owns a majority interest in Mahogany, Inc. In addition, he is president, secretary, and director of Diamond Enterprises, as well as a shareholder and director of Stone Path, Inc. He is a partner of the Cornerstone Partnership. He leases pig spaces from the Mahogany Nursery. In addition, he is a member of the Mahogany Group and has an ownership interest in the hogs finished at the Black Walnut and Stone Path hog finishing facilities and delivered to John Morrell under the terms of hog procurement contracts. He is one of the individuals responsible for creating the series of corporations and partnerships that owned the facilities at which the hogs delivered to John Morrell under the terms of the procurement contracts were born and raised to slaughter weight. He is an intended beneficiary of the hog procurement contract he signed with John Morrell.

Defendant Dale Thelen is an individual residing in Overland Park, Kansas. He is a partner of the Oakleaf Limited Partnership and a limited member of Oakleaf Ltd. He is also a shareholder of Mahogany, Inc. and a partner in the Mahogany partnership. He is a shareholder of Stone Path, Inc. He leases pig spaces from the Mahogany Nursery. In

14

addition, he is a member of the Mahogany Group and has an ownership interest in the hogs finished at the Black Walnut and Stone Path hog finishing facilities and delivered to John Morrell under the terms of hog procurement contracts. He is an intended beneficiary of the hog procurement contract with John Morrell that was signed on his behalf by Pete Simons.

Defendant Cyril Venner is an individual residing in Acadia, Iowa. He is a partner of the Oakleaf Limited Partnership and a limited member of Oakleaf Ltd. He is a member of the Mahogany Group and has an ownership interest in the hogs finished at the Black Walnut and Stone Path hog finishing facilities and delivered to John Morrell under the terms of hog procurement contracts. He is an intended beneficiary of the hog procurement contract with John Morrell that was signed on his behalf by Pete Simons.

Defendants Leon and Lavonne Wernimont are individuals residing in Carroll, Iowa. They are partners of the Oakleaf Limited Partnership and limited partners of Oakleaf Ltd. They are also shareholders of Magnolia, Inc. and partners in the Mahogany partnership. They lease pig spaces from the Mahogany Nursery. In addition, they are members of the Mahogany Group and have an ownership interest in the hogs finished at the Black Walnut and Stone Path hog finishing facilities and delivered to John Morrell under the terms of hog procurement contracts. They are intended beneficiaries of the hog procurement contract with John Morrell that was signed on his behalf by Pete Simons.

Defendant Don Gerken is an individual residing in Breda, Iowa. He has an ownership interest in the hogs that originate at Cornerstone, are finished at various Stone Path hog finishing facilities and delivered to John Morrell under the terms of hog procurement contracts. He is an intended beneficiary of the hog procurement contract with John Morrell that was signed on his behalf by Pete Simons.

Defendant Doug Gerken is an individual residing in Breda, Iowa. He has an ownership interest in the hogs that originate at Cornerstone, are finished at various Stone

15

Path hog finishing facilities and delivered to John Morrell under the terms of hog procurement contracts. He is an intended beneficiary of the hog procurement contract with John Morrell that was signed on his behalf by Pete Simons.

Defendant D&D Gerken, Inc. is an Iowa corporation with its principal place of business in Breda, Iowa. It has an ownership interest in the hogs that originate at Cornerstone, are finished at various Stone Path hog finishing facilities and delivered to John Morrell under the terms of hog procurement contracts. It is an intended beneficiary of the hog procurement contract with John Morrell that was signed on its behalf by Pete Simons.

Defendant Hubert Hagemann is an individual residing in Carroll, Iowa. He has an ownership interest in the hogs that originate at Cornerstone, are finished at various Stone Path hog finishing facilities and delivered to John Morrell under the terms of hog procurement contracts. He is an intended beneficiary of the hog procurement contract with John Morrell that was signed on his behalf by Pete Simons.

Defendant Dick Stark is an individual residing in Lake View, Iowa. He has an ownership interest in the hogs that originate at Cornerstone, are finished at various Stone Path hog finishing facilities and delivered to John Morrell under the terms of hog procurement contracts. He is an intended beneficiary of the hog procurement contract with John Morrell that was signed on his behalf by Pete Simons.

Defendants Joseph Halbur, Pete Simons, Mary Ann Borkowski, Eric Brincks, Vernon Brincks, Virginia Hagemann, Greg Halbur, Martin Halbur, Paul Halbur Jeff Klocke, Howard Koster, Robert Overmohle, Frank Rosener d/b/a Rosener Farms, Inc., Harry Reiman and Sally Reiman d/b/a Sals Ins. Inc., John Simons, Dale Thelen, Cyril Venner, Lavonne Wernimont, and Leon Wernimont were hog producers who sold their hogs to John Morrell under the Black Walnut and Stone Path Ledger Contracts ("the Mahogany Producers").

16

A portion of the 3,120 sows at the Oakleaf Unit are owned by the Mahogany Producers. The Mahogany Nursery is a 9,150 head hog nursery located in Carroll, Iowa. Some of the Mahogany Producers are also partners in the Mahogany Partnership. A portion of the weaner pigs from the Oakleaf Unit were purchased by the Mahogany Producers and subsequently transferred to the Mahogany Nursery.[1] The Mahogany Producers each had an interest in the ownership of pigs raised at the Mahogany Nursery. Pigs from the Mahogany Nursery were subsequently transferred to the Black Walnut, Stone Path I, Stone Path II, or Stone Path III finishing units and later sold to John Morrell pursuant to the Ledger Contracts.

The delivery of hogs to John Morrell for slaughter from the Mahogany Producers was coordinated by Diamond Enterprises. At the request of the Mahogany Producers, John Morrell sent payment to Diamond Enterprises for the hogs delivered to John Morrell by the Mahogany Producers. The Mahogany Producers paid the expenses associated with raising their hogs with the moneys received from John Morrell. The Mahogany Producers did this though Diamond Enterprises. Moneys received from John Morrell were used on behalf of the Mahogany Producers to pay for the purchase of weaner pigs from Oakleaf, to pay rent to the Mahogany Partnership for the use of the Mahogany Nursery, and to pay rent to Black Walnut, Inc., Stone Path, Inc. Stone Path II, and Stone Path III for the use of the finishing units at which the Mahogany Producers' hogs were raised to slaughter weight. The Mahogany Producers also used the moneys received from John Morrell to pay for the

---

[1]Weaner pigs are newborn pigs which stay at a sow farrowing unit until the age of six weeks. At that point, they are transferred to a nursery where they stay until they reach approximately 50 pounds. After that, the weaner pigs are transferred again to a finishing unit and kept there until reaching a weight of between 250 and 260 pounds. By this point, the hogs are fully grown and shipped to a slaughterhouse.

17

feeding and care of their hogs and for accounting and legal services provided through Diamond Enterprises.

Once all the costs of the Mahogany Producers were met, any remaining moneys were paid to the individual Mahogany Producers based on each producer's ownership interest in the hogs sold to John Morrell under the Ledger Contracts. On occasion, the Mahogany Producers were required to pay assessments to Diamond Enterprises when the expenses of raising and selling their hogs to John Morrell under the Ledger Contracts exceeded the moneys received from the sale of their hogs. These assessments reflected each individual Mahogany Producers' ownership interest in the hogs sold to John Morrell under the Ledger Contracts.

Defendants Pete Simons, John Simons, Don Gerken, Doug Gerken, Hubert Hagemann, Dick Stark, and Howard Koster were hog producers who sold their hogs to John Morrell under the Cornerstone Ledger Contract ("the Cornerstone Producers"). Cornerstone is a sow farrowing unit located in Audubon, Iowa. A portion of the sows housed at Cornerstone are owned by the Cornerstone Producers. The Cornerstone Producers' pigs born at the Cornerstone sow unit were subsequently transferred to either the Kautzky Nursery, the Northstar Nursery, or the Custer Nursery. From there, after reaching the appropriate weight, the Cornerstone Producers' pigs were transferred primarily to the Stone Path IV or Stone Path V finishing units. Upon reaching their slaughter weight, the Cornerstone Producers hogs were then delivered to John Morrell pursuant to the Cornerstone Ledger Contract.

The delivery of hogs from the Cornerstone Producers to John Morrell for slaughter was coordinated by Diamond Enterprises. At the request of the Cornerstone Producers, John Morrell sent payment to Diamond Enterprises for the hogs delivered to it by the Cornerstone Producers. The Cornerstone Producers paid the expenses associated with

18

raising their hogs with the moneys received from John Morrell. The Cornerstone Producers did this though Diamond Enterprises. Moneys received from John Morrell were used on behalf of the Mahogany Producers to pay for the purchase of weaner pigs from Cornerstone, to pay rent for the use of the Cornerstone sow unit, to pay rent to the Kautzky, Northstar, and Custer Nursery owners and to the owners of Stone Path IV and Stone Path V finishing units. The Cornerstone Producers also used the moneys received from John Morrell to pay for the feeding and care of their hogs and for accounting and legal services provided through Diamond Enterprises.

Once all the costs of the Cornerstone Producers were met, any remaining moneys were paid to the individual Cornerstone Producers based on each producer's ownership interest in the hogs sold to John Morrell under the Cornerstone Ledger Contract. On occasion, the Cornerstone Producers were required to pay assessments to Diamond Enterprises when the expenses of raising and selling their hogs to John Morrell under the Cornerstone Ledger Contract exceeded the moneys received from the sale of their hogs. These assessments reflected each individual Cornerstone Producers' ownership interest in the hogs sold to John Morrell under the Cornerstone Ledger Contract.

Diamond Enterprises did not own the hogs produced in either the Mahogany or Cornerstone production systems. Diamond Enterprises facilitated the production and sale of the hogs owned by the Mahogany Producers and the Cornerstone Producers by, among other things, arranging and paying for the care and feeding of the Mahogany Producers' and the Cornerstone Producers' hogs, coordinating the delivery of the Mahogany Producers' and the Cornerstone Producers' hogs to John Morrell for slaughter, receiving payments from John Morrell for the delivered hogs, providing accounting, financial and legal services and information to the Mahogany Producers and the Cornerstone Producers

19

and disbursing moneys or submitting assessments to the Mahogany Producers and the Cornerstone Producers.

Defendant Pete Simons signed each of the Ledger Contracts as "power of attorney" for each of the individual hog producers. Pete Simons was in charge of negotiating the three Ledger Contracts on behalf of the Mahogany Producers and the Cornerstone Producers. He was also responsible for the accounting aspects of the Ledger Contracts. He and his brother, John Simons, own a majority interest in Magnolia, Inc. and over thirty-five percent of the hogs owned by the Mahogany Producers and a substantial percentage of the hogs owned by the Cornerstone Producers.

Neither the Mahogany Producers nor the Cornerstone Producers differentiated as to which individual hog belonged to which individual producer. Instead, each producer owned a percentage of all the hogs sold to John Morrell under the Ledger Contracts. Individuals in the Mahogany Producers received moneys from Diamond Enterprises in direct proportion to the ownership interest percentage they held in the hogs produced through the Mahogany system. Similarly, the individual producers in the Cornerstone Producers received moneys from Diamond Enterprises in direct proportion to the ownership interest percentage they held in the hogs produced through the Cornerstone production system. Likewise, individuals in the Mahogany Producers were also asked, on occasion, to pay assessments to Diamond Enterprises in direct proportion to the ownership percentage they held in the hogs produced through the Mahogany production system. When necessary, the individual Cornerstone Producers were required to make payments to Diamond Enterprises in direct proportion to the ownership percentage they held in the hogs produced through the Cornerstone production system.

The Mahogany Producers and the Cornerstone Producers knew that Pete Simons executed the Ledger Contracts on their behalf and authorized him to do so. During the

20

period of February 1998 through October 2002, Diamond Enterprises sent monthly reports to the Mahogany Producers and the Cornerstone Producers which contained a detailed accounting of the ledger deficits under the Ledger Contracts as well as copies of the "ledger balance reports" prepared by John Morrell.

John Morrell fully performed its obligations under the terms of the Ledger Contracts. During the entire term of the Ledger Contracts, when the market price was less than the contract floor price, John Morrell paid defendants the higher contract floor price. Each time that occurred, the defendants' ledger deficits increased. As the end of the term of the Ledger Contracts approached, John Morrell was concerned whether defendants had the financial ability and intent to repay their ledger account deficits. As a result, John Morrell approached the Mahogany Producers and the Cornerstone Producers in order to receive adequate assurance of their intent to repay their ledger deficits. The Mahogany Producers and the Cornerstone Producers refused to provide John Morrell with any sort of assurance that they would repay their ledger deficit as it because due. Thus, on October 27, 2002, John Morrell interpreted defendants' response to be a repudiation of the Ledger Contracts and terminated the Ledger Contracts. Under the terms of the Ledger Contracts, the defendant producers had thirty days in which to remit payment to John Morrell for the ledger deficits. The leger deficits totaled $1,852,575.66. John Morrell did not receive payment from the defendant producers for the ledger deficits by November 26, 2002, and have not received them to this date.

## II.  LEGAL ANALYSIS

### A.  Rule 12(b)(6) Standards

The issue on a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted is not whether a plaintiff will ultimately prevail, but whether

21

the plaintiff is entitled to offer evidence in support of his, her, or its claims. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *United States v. Aceto Agric. Chem. Corp.*, 872 F.2d 1373, 1376 (8th Cir. 1989). In considering a motion to dismiss under Rule 12(b)(6), the court must assume that all facts alleged by the complaining party are true, and must liberally construe those allegations. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Gross v. Weber*, 186 F.3d 1089, 1090 (8th Cir. 1999) ("On a motion to dismiss, we review the district court's decision de novo, accepting all the factual allegations of the complaint as true and construing them in the light most favorable to [the non-movant]."); *St. Croix Waterway Ass'n v. Meyer*, 178 F.3d 515, 519 (8th Cir. 1999) ("We take the well-pleaded allegations in the complaint as true and view the complaint, and all reasonable inferences arising therefrom, in the light most favorable to the plaintiff."); *Gordon v. Hansen*, 168 F.3d 1109, 1113 (8th Cir. 1999) (same); *Midwestern Machinery, Inc. v. Northwest Airlines*, 167 F.3d 439, 441 (8th Cir. 1999) (same); *Wisdom v. First Midwest Bank*, 167 F.3d 402, 405 (8th Cir. 1999) (same); *Duffy v. Landberg*, 133 F.3d 1120, 1122 (8th Cir.) (same), *cert. denied*, 525 U.S. 821 (1998); *Doe v. Norwest Bank Minn., N.A.*, 107 F.3d 1297, 1303-04 (8th Cir. 1997) (same); *WMX Techs., Inc. v. Gasconade County, Mo.*, 105 F.3d 1195, 1198 (8th Cir. 1997) (same); *First Commercial Trust v. Colt's Mfg. Co.*, 77 F.3d 1081, 1083 (8th Cir. 1996) (same).

The court is mindful that, in treating the factual allegations of a complaint as true pursuant to Rule 12(b)(6), the court must "reject conclusory allegations of law and unwarranted inferences." *Silver v. H&R Block, Inc.*, 105 F.3d 394, 397 (8th Cir. 1997) (citing *In re Syntex Corp. Securities Lit.*, 95 F.3d 922, 926 (9th Cir. 1996)); *Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990) (the court "do[es] not, however, blindly accept the legal conclusions drawn by the pleader from the facts," citing *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987), and 5 C. Wright & A. Miller,

Case 3:06-cv-03023-MWB   Document 56   Filed 03/05/07   Page 22 of 32

FEDERAL PRACTICE AND PROCEDURE § 1357, at 595-97 (1969)); *see also LRL Properties v. Portage Metro Hous. Auth.*, 55 F.3d 1097, 1103 (6th Cir. 1995) (the court "need not accept as true legal conclusions or unwarranted factual inferences," quoting *Morgan*, 829 F.2d at 12). Conclusory allegations need not and will not be taken as true; rather, the court will consider whether the *facts* alleged in the plaintiffs' complaint, accepted as true, are sufficient to state a claim upon which relief can be granted. *Silver*, 105 F.3d at 397; *Westcott*, 901 F.2d at 1488.

The United States Supreme Court and the Eighth Circuit Court of Appeals have both observed that "a court should grant the motion and dismiss the action 'only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.'" *Handeen v. Lemaire*, 112 F.3d 1339, 1347 (8th Cir. 1997) (quoting *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S. Ct. 2229, 81 L. Ed. 2d 59 (1984)); *accord Conley*, 355 U.S. at 45-46 ("A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his [or her] claim which would entitle him [or her] to relief."); *Meyer*, 178 F.3d at 519 ("The question before the district court, and this court on appeal, is whether the plaintiff can prove any set of facts which would entitle the plaintiff to relief" and "[t]he complaint should be dismissed 'only if it is clear that no relief can be granted under any set of facts that could be proved consistent with the allegations,'" quoting *Frey v. City of Herculaneum*, 44 F.3d 667, 671 (8th Cir. 1995)); *Gordon*, 168 F.3d at 1113 ("We will not dismiss a complaint for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts that would demonstrate an entitlement to relief."); *Midwestern Machinery, Inc.*, 167 F.3d at 441 (same); *Springdale Educ. Ass'n v. Springdale Sch. Dist.*, 133 F.3d 649, 651 (8th Cir. 1998) (same); *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 546 (8th Cir. 1997) (same); *Doe*, 107 F.3d at 1304 (same); *WMX Techs., Inc.*, 105 F.3d

23

at 1198 (same). Rule 12(b)(6) does not countenance dismissals based on a judge's disbelief of a complaint's factual allegations. *Neitzke v. Williams*, 490 U.S. 319, 327 (1989). Thus, "[a] motion to dismiss should be granted as a practical matter only in the unusual case in which a plaintiff includes allegations that show on the face of the complaint that there is some insuperable bar to relief." *Frey*, 44 F.3d at 671 (internal quotation marks and ellipses omitted); *accord Parnes*, 122 F.3d at 546 (also considering whether there is an "insuperable bar to relief" on the claim). With these standards in mind, the court turns to consideration of defendants' motion to dismiss.

### B.  Choice Of Law

Before analyzing the legal sufficiency of John Morrell's claims, the court must first resolve which state's law should be used to determine the validity of the claims at issue in this litigation—the law of Iowa, where the majority of defendants reside and where all of the hogs were raised, or the law of South Dakota, the state whose law is identified in the Ledger Contracts as governing all aspects of those agreements.

The court has confronted the often knotty problem of what law applies to specific common-law and statutory claims in a diversity action a number of times in recent years. *See Jones ex rel. Jones v. Winnebago Indus. Inc.*, ___ F. Supp. 2d ___, No. C05-3042-MWB, 2006 WL 3095946, at*7-15 (N.D. Iowa Nov. 1, 2006); *Jones Distrib. Co., Inc. v. White Consol. Indus., Inc.*, 943 F. Supp. 1445, 1458 (N.D. Iowa 1996); *Harlan Feeders, Inc. v. Grand Labs., Inc.*, 881 F. Supp. 1400 (N.D. Iowa 1995); *Curtis 1000*, 878 F. Supp. at 1251-54. To resolve the issue of which state's law applies to John Morrell's claims, the court looks to the conflict-of-laws or choice-of-law rules of the state of Iowa, because in an action based upon diversity of citizenship jurisdiction, a federal district court must apply the substantive law of the state in which it sits, including its conflict-of-laws or choice-of-

24

law rules. *Harlan Feeders, Inc.*, 881 F. Supp. at 1403-04 (citing, *inter alia, Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)); *accord Colonial Ins. Co. of Cal. v. Spirco Envtl., Inc.*, 137 F.3d 560, 561-62 (8th Cir. 1998) ("' Federal district courts must apply the choice-of-law rules of the state in which they sit when jurisdiction is based on diversity of citizenship.'") (quoting *Whirlpool Corp. v. Ritter*, 929 F.2d 1318, 1320 (8th Cir. 1991)); *Penney v. Praxair, Inc.*, 116 F.3d 330, 333 n. 4 (8th Cir. 1997) ("Sitting in diversity, a district court is bound to apply the choice of law rules of the state in which it sits . . . .").

However, before any choice of law need be made, there must be a "true conflict" between the laws of the possible jurisdictions on the pertinent issue. *Id.* at 1404; *accord Phillips v. Marist Soc'y of Wash. Province*, 80 F.3d 274, 276 (8th Cir. 1996) (agreeing with the statement of Judge Richard A. Posner that "'before entangling itself in messy issues of conflict of laws a court ought to satisfy itself that there actually is a difference between the relevant laws of the different states.' *Barron v. Ford Motor Co. of Canada, Ltd.*, 965 F.2d 195, 197 (7th Cir. 1992), *cert. denied,* 506 U.S. 1001, 113 S. Ct. 605, 121 L. Ed. 2d 541 (1992)," and simply applying the law of the forum where there was no true conflict).

Defendants assert that the legal principals involved in this case are rooted in the common law of contracts and are the same for both Iowa and South Dakota. Thus, defendants argue that the court need not decide the issue of choice of law. John Morrell does not suggest that the common law of contracts is not the same for both Iowa and South Dakota but asserts that because the Ledger Contracts state that they are governed by the laws of the State of South Dakota, the court should apply South Dakota law to its contract and quasi-contract claims.

25

Under the Iowa choice-of-law or conflict-of-laws test for contract actions, the parties may, with certain restrictions, select for themselves the law that will apply to their contract. *Harlan Feeders*, 881 F. Supp. at 1411 (citing *Cole*, 296 N.W.2d at 781, in turn citing RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 187).   Because conflicts of law are inevitable in a federal system, parties to a contract are empowered to and frequently do choose a particular state's law to apply to the execution and interpretation of the contract. Absent special circumstances, courts usually honor the parties' choice of law because two "prime objectives" of contract law are "to protect the justified expectations of the parties and to make it possible for them to foretell with accuracy what will be their rights and liabilities under the contract." RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 187 cmt. e.  Here, a choice of law clause is part of the contract.   The court will therefore respect the parties' determination that their agreements be governed by South Dakota law and apply South Dakota law to John Morrell's claims.

### C.  Analysis Of Specific Claims

#### 1.      Breach of contract claims

Defendants assert that John Morrell's contract claims fail as a matter of law because they, the defendants, are not explicitly named in the Ledger Contracts.  John Morrell counters that the "producer" entities identified in the three contracts as "Diamond Enterprises/Black Walnut", "Diamond Enterprises/Stone Path", and "Diamond Enterprises/Cornerstone",  are only listed on the line of the Ledger Contracts titled "Trading or Doing Business as"  while the line of the Ledger Contract titled "Full Name of the Producer" lists "Pete Simons (power of attorney)."   John Morrell points out that it has alleged in its complaint that Pete Simons signed all three Ledger Contracts as "power of attorney" for the individual defendants, who were trading or doing business as

26

""Diamond Enterprises/Black Walnut", "Diamond Enterprises/Stone Path", and "Diamond Enterprises/Cornerstone" and that defendants both knew he was engaged in such activity and had authorized him to do so. Complaint at ¶¶ 61, 62, 103, and 114. John Morrell further argues that because defendants entered into the Ledger Contracts through representative names and with Pete Simons acting on their behalf, defendants are bound contractually even though they are not named in the Ledger Contracts.

Under South Dakota law, a breach of contract claim has three elements: "'1. An enforceable promise; 2. A breach of the promise; 3. Resulting damages.'" *Weitzel v. Sioux Valley Heart Partners*, 714 N.W.2d 884, 894 (S.D. 2006) (quoting *Guthmiller v. Deloitte & Touche, L.L.P.*, 699 N.W.2d 493, 498 (S.D. 2005)); *accord McKie v. Huntley*, 620 N.W.2d 599, 17 (S. D. 2000). A contract can be either express or implied. S.D. CODIFIED LAWS § 53-1-3. "An express contract is one, the terms of which are stated in words. An implied contract is one, the existence and terms of which are manifested by conduct." *Id*. With respect to the first element, South Dakota Codified Laws 53-1-2 sets forth the essential elements of a contract and provides that:

> Elements essential to existence of a contract are:
> (1) Parties capable of contracting;
> (2) Their consent;
> (3) A lawful object; and
> (4) Sufficient cause or consideration.

S.D. CODIFIED LAWS § 53-1-2; *see Mueller v. Cedar Shore Resort, Inc.*, 643 N.W.2d 56, 70 (S.D. 2002); *Paint Brush Corp. v. Neu*, 599 N.W.2d 384, 393 (S.D. 1999); *Beraets v. Halter*, 588 N.W.2d 231, 234 (S.D. 1999).

The South Dakota Supreme Court has defined a breach of contract as:

> "[a] violation of a contractual obligation, either by failing to perform one's own promise or by interfering with another party's performance." Black's Law Dictionary 182 (7th ed

27

1999). "A breach may be one by non-performance, or by repudiation, or by both." *Id.* (quoting Restatement (Second) of Contracts § 236 cmt. a (1981)). "A breach of contract caused by a party's anticipatory repudiation, i.e., unequivocally indicating that the party will not perform when performance is due[,]" allows the nonbreaching party to treat the repudiation as an immediate breach of contract and sue for damages. *Id.* This type of breach is known either as an anticipatory breach or constructive breach. *Id.*

*Weitzel*, 714 N.W.2d at 894.

With respect to the third element, damages, in an action for breach of contract, "the plaintiff is entitled to recover all his detriment proximately caused by the breach, not exceeding the amount he would have gained by full performance." *Regan v. Moyle Petroleum*, 344 N.W.2d 695, 696 (S.D. 1984) (citing *Big Band, Inc. v. Williams*, 87 S.D. 24, 202 N.W.2d 121 (1972)).

The dispute here centers on whether John Morrell has alleged facts which would support the first element of its breach of contract claim. The court concludes that the fact that only Pete Simons signed the Ledger Contracts does not preclude their enforcement against the individual defendants. The Ledger Contracts clearly indicate that they were being entered into by hog producers who were using the trade name or doing business as Diamond Enterprises/Black Walnut, Diamond Enterprises/Cornerstone, and Diamond Enterprises/Stone Path. Significantly, while there exists corporate entities in Iowa called Diamond Enterprises, Inc., Black Walnut, Inc., Cornerstone, Inc. and five corporations bearing some form of the name "Stone Path," there are no corporate entities bearing the names "Diamond Enterprises/Black Walnut," "Diamond Enterprises/Cornerstone," or "Diamond Enterprises/Stone Path." Thus, there is no allegation in the complaint that Pete Simons signed the Ledger Contracts on behalf of existing corporate entities. Rather, Pete

28

Simons signed each of the Ledger Contracts as "power of attorney" for each of the individual hog producers and was in charge of negotiating the three Ledger Contracts on behalf of the Mahogany Producers and the Cornerstone Producers. As a result, the individual defendants knew that Pete Simons executed the Ledger Contracts on their behalf and authorized him to do so.

"'Individuals may be bound contractually though not named in the contract but merely described by a trade or partnership or association name or otherwise.'" *Hartford Financial Sys., Inc. v. Florida Software Servs., Inc.*, 550 F. Supp. 1079, 1087 (D.C. Me. 1982) (quoting 17 AM. JUR. 2D CONTRACTS § 295 at 712 (1964)); *see Carroll v. Sparks*, 218 A.2d 517, 518 (D.C. 1966) ("The fact that the purchaser used a trade name in no way made the agreement void or unenforceable. 'A contract entered into under an assumed, ficititious, or representative name is generally valid and binding. * * * Individuals may be bound contractually though not named in the contract but merely described by a trade or partnership or association name or otherwise.'" ) (quoting 17 AM. JUR. 2D CONTRACTS § 295 at 712 (1964)); *Members of B. & C.W. Union v. Hall Baking Co.*, 320 Mass. 286, 292, 69 N.E.2d 111, 114 (1946) ("It is common in the law for individuals to be bound contractually though not named but merely described by the use of a trade or partnership or association name, or otherwise."). Therefore, even though the individual defendants are not named as parties in the Ledger Contracts, the Ledger Contracts are binding against them because it is alleged that they were doing business as Diamond Enterprises/Black Walnut, Diamond Enterprises/Cornerstone, or Diamond Enterprises/Stone Path, entities which did not have any independent legal status. *See Duval v. Midwest Auto City, Inc.*, 425 F. Supp. 1381, 1387 (D. Neb. 1977) (holding that individuals were proper parties to lawsuit instead of business entity in which they were doing business as). Thus, this portion of defendants' motion to dismiss is denied.

## 2. Unjust enrichment claims

Defendants also assert that John Morrell has failed to state an unjust enrichment claim against them.[2] John Morrell contests this assertion. Under South Dakota law, "[u]njust enrichment occurs 'when one confers a benefit upon another who accepts or acquiesces in that benefit, making it inequitable to retain that benefit without paying.'" *Hofedt v. Mehling*, 658 N.W.2d 783, 788 (S.D. 2003) (quoting *Parker v. Western Dakota Insurors, Inc.*, 605 N.W.2d 181, 192 (S.D. 2000)); *accord Miller v. Jacobsen*, 714 N.W.2d 69, 81 (S.D. 2006); *Juttelstad v. Juttelstad*, 587 N.W.2d 447, 451 (S.D. 1998); *see Sporleder v. Van Liere*, 569 N.W.2d 8, 12 (S.D. 1997); *Randall Stanley Architects, Inc. v. All Saints Community Corp.*, 1996 SD 138, ¶ 20, 555 N.W.2d 802, 805 (S.D. 1996). When a claim of unjust enrichment is established, "the law implies a contract obligating the beneficiary to compensate the benefactor for the value of the benefit conferred." *Hofedt*, 658 N.W.2d at 788; *accord Mack v. Mack*, 613 N.W.2d 64, 69 (S.D. 2000). In order to establish unjust enrichment, three elements must be proven: (1) a benefit was received; (2) the recipient was cognizant of that benefit; and (3) the retention of the benefit without reimbursement would unjustly enrich the recipient. *Hofedt*, 658 N.W.2d at 788; *Action Mechanical, Inc. v. Deadwood Historic Preservation Comm'n*, 652 N.W.2d 742, 750 (S.D. 2002); *Mack*, 613 N.W.2d at 69; *Parker*, 605 N.W.2d at 192; *Juttelstad*, 587 N.W.2d at 451; *Bollinger v. Eldredge*, 524 N.W.2d 118, 122-23 (S.D. 1994).

---

[2] Defendants have raised this issue relying solely on Iowa law. As the court has noted above, South Dakota law is controlling in this case. Therefore, while the court will address defendants' assertions regarding John Morrell's unjust enrichment claims, it will do so applying South Dakota law.

30

Upon review of the complaint in this matter, the court concludes that John Morrell has alleged all three elements of an unjust enrichment claim. First, John Morrell alleges that it conferred a benefit on defendants, pursuant to the terms of the Ledger Contracts, by paying them a large sum of money in excess of market price for their hogs. With respect to the second element, John Morrell alleges in its complaint that defendants knew they were receiving above market price for their hogs pursuant to the Ledger Contracts. It is specifically alleged that, in August, 1998, due to the low market price for hogs, John Morrell sent a letter to its ledger contract producers to alleviate concerns of such hog producers regarding the possibility of increasing negative leger balances. With respect to the third element, proof of unfairness in retaining the benefit without reimbursement, "the relevant inquiry is whether the circumstances are such that equitably the beneficiary should restore to the benefactor the benefit or its value." *Hofedt*, 658 N.W.2d at 788 (citing *United States v. Applied Pharmacy Consultants, Inc.*, 182 F.3d 603, 607 (8th Cir.1999)). John Morrell satisfies this element in its allegation that defendants received unjust enrichment because they received more than market value for their hogs during the term of the Ledger Contracts. Therefore, the court has little difficulty in concluding that John Morrell has stated an unjust enrichment claim against them.

Defendants assert that John Morrell has failed to plead facts which would support a finding that there is no adequate remedy at law for its claim and directs the court's attention to John Morrell's contract claims. This argument ignores black letter law that a party may plead alternative remedies. Under South Dakota's rules of pleading, a party may pursue alternative remedies so long as no double recovery is awarded. SDCL 15-6-8(a) (providing that "[r]elief in the alternative or of several different types may be demanded."); *see Parker*, 605 N.W.2d at 192 (noting that plaintiff brought both contract and unjust enrichment claims in the alternative). Therefore, having found that John

Case 3:06-cv-03023-MWB   Document 56   Filed 03/05/07   Page 31 of 32

Morrell has alleged an unjust enrichment claim against defendants in the alternative to its contract claims, this portion of defendants' motion to dismiss is also denied.

### 3.    *Claim for an accounting*

Defendants also seek the dismissal of John Morrell's claim for an accounting on the ground that this claim must be dismissed once John Morrell's underlying contract and unjust enrichment claims have been dismissed because it is a derivative remedy and dependent on the validity of the underlying contract and unjust enrichment claims. Because the court has already found that John Morrell has stated valid contract and unjust enrichment claims, defendants cannot prevail on this point either and this portion of defendants' motion to dismiss is also denied.


## III.  CONCLUSION

For the reasons addressed above, the court concludes that plaintiff John Morrell has adequately pleaded facts to state claims for breach of contract and unjust enrichment. Moreover, because John Morrell has adequately pleaded breach of contract and unjust enrichment claims, its claim for an accounting also survives defendants' motion. Therefore, defendants' motion to dismiss is denied in its entirety.

**IT IS SO ORDERED.**

**DATED** this 5th day of March, 2007.

Mark W. Bennett
_____
MARK W. BENNETT
U. S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA